IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
DELTA DIVISION

JOHN D. ROSS                                                                                              PLAINTIFF
ADC #158910

v.                                           2:20-cv-00235-KGB-JJV

GREG RECHCIGL,
Health Services Administrator, EARU; *et al.*                                        DEFENDANTS

### RECOMMENDED DISPOSITION

The following Recommended Disposition ("Recommendation") has been sent to United States District Judge Kristine G. Baker. Any party may serve and file written objections to this Recommendation. Objections should be specific and include the factual or legal basis for the objection. If the objection is to a factual finding, specifically identify that finding and the evidence that supports your objection. Your objections must be received in the office of the United States District Court Clerk no later than fourteen (14) days from the date of this Recommendation. Failure to file timely objections may result in a waiver of the right to appeal questions of fact.

I.   **INTRODUCTION**

John D. Ross ("Plaintiff") is a prisoner in the East Arkansas Regional Unit of the Arkansas Division of Correction ("ADC"). He has filed this *pro se* action, pursuant to 42 U.S.C. § 1983, alleging Defendants violated his Eighth Amendment right to receive adequate medical care. His remaining claims are that from July 3, 2018 until August 23, 2020, Defendants: (1) Health Services Administrator ("HSA") Greg Rechcigl, Dr. Gary R. Kerstein, APN Geraldine Campbell, APN Patrick Drummond, APN Tracy Bennett, and LPN Angela Mixon failed to provide him with adequate medical care for lower back pain, as well as edema and cellulitis in his lower

legs; (2) HSA Charlotte Gardner failed to take corrective action in response to his medical grievances; and (3) Wellpath LLC, CEO Jorge Dominicus, CFO Juan Perez, and Chief Clinical Officer Dr. Thomas Pangburn created or condoned a policy, practice, or custom of improperly denying constitutionally inadequate medical care to prisoners for cost-saving reasons.[1]  (Doc. 2.)

Defendants have filed a Motion for Summary Judgment (Docs. 173-175) and a Supplemental Motion for Summary Judgment (Doc. 202.)  Plaintiff has filed "Objections to the Request for Summary Judgment" (Doc. 195) and a "Motion for Summary Judgment, Declaratory Judgment, and Directed Verdict" (Doc. 197).  Although he was given the opportunity to file a Supplemental Response, Plaintiff did not do so.  (Doc. 212.)  After careful consideration and for the following reasons, I recommend Defendants' Motions be GRANTED, Plaintiff's Motion be DENIED, and the claims against Defendants Rechcigl, Gardner, Kerstein, Campbell, Drummond, Bennett, Mixon, Wellpath LLC, Dominicus, Perez, and Pangburn be DISMISSED with prejudice.

## II. SUMMARY JUDGEMENT STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex v. Catrett*, 477 U.S. 317, 321 (1986).  When ruling on a motion for summary judgment, the court must view the

---

[1] The Complaint begins when Plaintiff entered the ADC in October 2014.  (Doc. 2.)  However, Plaintiff is only proceeding with claims arising between July 3, 2018 and August 23, 2020, which are the first and last dates of care in the Complaint that fall within the three-year statute of limitations.  (*Id.*; Doc. 185.)  The Court has previously dismissed several claims and Defendants without prejudice due to the failure to state a claim and the lack of exhaustion.  (Docs. 185, 186). And, at this time, a Partial Recommendation suggesting Plaintiff's claims against Defendant Dycus be dismissed with prejudice is pending.  (Doc. 184.)

evidence in a light most favorable to the nonmoving party. *Naucke v. City of Park Hills*, 284 F.3d 923, 927 (8th Cir. 2002). The nonmoving party may not rely on allegations or denials but must demonstrate the existence of specific facts that create a genuine issue for trial. *Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007). The nonmoving party's allegations must be supported by sufficient probative evidence that would permit a finding in his favor on more than mere speculation, conjecture, or fantasy. *Id.* (citations omitted). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case. *Othman v. City of Country Club Hills*, 671 F.3d 672, 675 (8th Cir. 2012). Disputes that are not genuine or that are about facts that are not material will not preclude summary judgment. *Sitzes v. City of West Memphis, Ark.*, 606 F.3d 461, 465 (8th Cir. 2010).

### III. DISCUSSION

#### A. Inadequate Medical Care Claims

"The Eighth Amendment requires state prison officials to provide inmates with needed medical care." *Cullor v. Baldwin*, 830 F.3d 830, 836 (8th Cir. 2016). To defeat summary judgment and proceed to trial on his Eighth Amendment inadequate medical care claims, Plaintiff must have evidence: (1) he had an objectively serious need for medical care; and (2) Defendants subjectively knew of, but deliberately disregarded, those serious medical needs. *See Shipp v. Murphy*, 9 F.4th 694, 703 (8th Cir. 2021); *Barr v. Pearson*, 909 F.3d 919, 921 (8th Cir. 2018). Defendants do not contest the first element. Thus, the issue is whether there is evidence they were deliberately indifferent to Plaintiff's medical needs. Deliberate indifference is a high threshold that goes well beyond negligence or gross negligence. *Langford v. Norris*, 614 F.3d 445, 460 (8th Cir. 2010). To establish deliberate indifference, there must be evidence prison

3

officials "recognized that a substantial risk of harm existed and knew that their conduct was inappropriate in light of that risk." *Shipp*, 9 F.4th at 703 (emphasis in the original). This level of mental culpability is "akin to criminal recklessness." *Id.* And a mere disagreement with the course of medical care does not rise to the level of a constitutional violation. *Langford*, 614 F.3d at 460; *Barr*, 909 F.3d at 921-22. Keeping these principles in mind, I will now discuss Plaintiff's complex medical allegations separately. Unless otherwise stated, the relevant facts are taken from his medical records. (Doc. 175.)

### 1. Edema and Cellulitis in Lower Legs

In July 2018, APN Campbell examined Plaintiff in the chronic care unit for his high blood pressure and noted Plaintiff had pitting edema of 2-3+ in both of his lower legs. (Docs. 175-1, 175-2.) Plaintiff was 6'3" and weighed 272 pounds, which was an increase of thirty-four pounds in five months. (*Id.*) APN Campbell changed Plaintiff's high blood pressure medications, prescribed medicines to reduce his cholesterol and edema, added potassium, and ordered more blood work. (*Id.*) In August 2018, APN Drummond doubled Plaintiff's diuretics because he complained of lower leg swelling and his weight had increased to 284 pounds. (Docs. 175-3, 175-4, 175-5.) And APN Campbell ordered an EKG and chest x-ray. (*Id.*) In October 2018, APN Drummond diagnosed Plaintiff with hypothyroidism, based on recent lab results, and started him on thyroid medication as well as a cardiac diet. (Doc. 175-6.) Two months later, in December 2018, APN Campbell determined from additional blood tests that Plaintiff was prediabetic. (Doc. 175-8.) She then gave him diet and exercise instructions. (*Id.*)

On February 7, 2019, Plaintiff said the edema had worsened, and he requested medical shoes and socks. (Doc. 175-14.) A non-party nurse recorded Plaintiff's edema as still being 2-3+. (*Id.*) APN Drummond ordered furosemide injections to reduce the edema, potassium, and

orthopedic hose. (*Id.*) On February 14, 2019, APN Drummond determined Plaintiff's edema had increased to 4+ and that his hose and shoes did not fit properly. (Doc. 175-15.) In response, APN Drummond ordered an appointment with a cardiologist, an evaluation for orthopedic hose and shoes, blood tests, a urinalysis, furosemide injections, and potassium. (*Id.*) And, on February 25, 2019, APN Drummond counseled Plaintiff on his diet and leg positions to avoid. (Doc. 175-16.) Plaintiff did not have a fever during any of these appointments, or any unusual redness in his lower legs.

On April 1, 2019, Plaintiff had a 99.3 fever, was vomiting, and could not walk. (Doc. 175-17.) APN Campbell admitted Plaintiff into the infirmary for observation, ordered an antibiotic injection, and prescribed Tylenol. (*Id.*) The next day, APN Drummond determined Plaintiff, who had a fever of 101.5, had cellulitis in both of his lower legs.[2] (*Id.*) To treat that condition, APN Drummond prescribed two types of intravenous antibiotics, continued Tylenol, and ordered an x-ray that ruled out a bone infection. (*Id.*) Plaintiff's temperature was normal by April 4, 2019, and his infection dissipated. (*Id.*) But he still had some edema in both of his legs. (*Id.*)

On April 9, 2019, Plaintiff was taken to a cardiologist, who determined Plaintiff had venous reflux with dilation in his lower legs. (Doc. 175-18.) And, he recommended that vascular condition be treated with four rounds of Varithena foam. (*Id.*) APN Campbell authorized that recommended treatment, which Plaintiff received on May 7, 2019. (*Id.*) However, Plaintiff refused to receive the next three treatments because the six-hour van ride to the cardiologist was

---

[2] According to the Mayo Clinic website, cellulitis "is a common, potentially serious bacterial skin infection" that causes the skin to become "swollen," "inflamed," "painful," and "warm to the touch." It "usually affects the lower legs" and "happens when a break in the skin allows bacteria to enter." *See* https://www.mayoclinic.org/diseases-conditions/cellulitis/symptoms-causes/syc-20370762.

5

painful and the driver allegedly was texting while driving. (*Id.*, Doc. 195 at 14.) Thereafter, APN Campbell and Dr. Kerstein approved compression hose recommended by a private company to treat the continued edema in Plaintiff's lower legs. (Docs. 175-20, 175-25.)

Plaintiff says that "no matter how many times" he was seen, the "appropriate treatment was not rendered, and the only conclusion that could be drawn by anyone with an I.Q. higher than a pork chop would be that it was done deliberately and/or maliciously." (Doc. 195 at 3.) I disagree.

Based on the medical records, it is clear Defendants treated Plaintiff's complex medical problems with numerous examinations and diagnostic tests, a variety of medications, compression hose, dietary restrictions, instructions on leg positions, a consultation with a cardiologist, and implementation of the cardiologist's recommended care. And it is undisputed that when Plaintiff developed bilateral cellulitis, he was promptly admitted into the infirmary where he received IV antibiotics and other medications that effectively cured his condition. Nothing about this undisputed course of medical treatment suggests deliberate indifference to Plaintiff's medical needs. *See Fourte v. Faulkner Cnty.*, 746 F.3d 384, 390 (8th Cir. 2014) (no deliberate indifference when medical providers "made efforts to cure the problem in a reasonable and sensible manner"); *Logan v. Clarke*, 119 F.3d 647, 649-50 (8th Cir. 1997) (prison doctors were not deliberately indifferent when they treated the prisoner on "numerous occasions" and "made efforts to cure the problem in a reasonable and sensible manner"). And, although the transportation to the cardiologist was uncomfortable, Plaintiff's refusal to cooperate with the recommended treatments does not help his cause. *See Beck v. Skon*, 253 F.3d 330, 333-34 (8th Cir. 2001) (affirming summary judgment when, among other things, a prisoner failed to comply with the recommended treatment); *Gibson v. Weber,* 433 F.3d 642, 646 (8th Cir. 2006) (finding a prisoner's "decision to

6

decline medical treatment" was a relevant factor in granting summary judgment).

Importantly, Dr. Timothy McClure, who is a family and emergency medicine physician, says in his affidavit Defendants provided Plaintiff with adequate and medically appropriate care. (Doc. 202-1.) "In the face of medical records indicating that treatment was provided and physician affidavits indicating that the care provided was adequate, an inmate cannot create a question of fact by merely stating that he did not feel he received adequate treatment." *Cejvanovic v. Ludwick*, 923 F.3d 503, 507-08 (8th Cir. 2019); *Dulany*, 132 F.3d at 1240 (same). Plaintiff has not offered any evidence to contradict Dr. McClure's professional medical opinion.

Instead, Plaintiff says Defendants should have diagnosed cellulitis sooner by ordering blood and urine tests when he first started having edema in his lower legs. (Docs. 195, 197.) But the record demonstrates these tests were ordered several times. And there is no evidence Plaintiff had cellulitis before he was admitted into the infirmary on April 1, 2019. The edema Plaintiff experienced prior to that date could have been caused by his complex medical problems including vascular disease in his lower legs, hypertension, hypothyroidism, high cholesterol, prediabetes, and obesity. *See Alberson v. Norris*, 458 F.3d 762, 765–66 (8th Cir. 2006) (when "the complaint involves treatment of a prisoner's sophisticated medical condition, expert testimony is required to show proof of causation"). And it is undisputed Plaintiff continued to have edema in his legs after his April 2019 cellulitis resolved. Thus, there is no evidence to support Plaintiff's assertion that Defendants failed, with deliberate indifference, to timely diagnose and treat his cellulitis or other complex medical problems. *See Redmond v. Kosinski*, 999 F.3d 1116 (8th Cir. 2021) ("A prisoner alleging a delay in treatment must present verifying medical evidence that the prison officials ignored an acute or escalating situation or that these delays adversely affected his prognosis").

In sum, Plaintiff did not have an Eighth Amendment right to receive the medical care of his choosing, and his mere disagreement with the course of provided medical care does not rise to the level of a constitutional violation. *See Barr*, 909 F.3d at 921-22. Because there is no evidence Defendants acted with deliberate indifference to Plaintiff's complex medical issues resulting in edema and cellulitis in his lower legs, I conclude they are entitled to summary judgment on this claim.

### 2.  Walker for Lower Back Pain

In his verified Complaint, Plaintiff describes his numerous attempts, starting soon after he arrived at the ADC in October 2014, to obtain a wheelchair or walker to accommodate chronic lower back pain. (Doc. 2.) Plaintiff says that, in January 2017, he received a four-wheeled walker with a seat, a release from work duties, and a script excluding him from having to climb stairs. (*Id.* at 38.) But it is unclear who ordered these accommodations or why they did so. (*Id.*) And, as previously explained, Plaintiff's medical care claims have been limited to those arising between July 3, 2018 and August 23, 2020. (Doc. 185.)

On August 8, 2018, APN Campbell examined Plaintiff in response to his complaints of lower back pain. (Doc. 175-3.) She noted that a July 2016 x-ray of his spine was normal. (*Id.*) She then ordered ibuprofen and a muscle relaxer for pain and scheduled a new x-ray of Plaintiff's lumbar spine. (*Id.*) Although it is unclear, it appears the new x-ray was normal because no follow-up appointment was scheduled. (*Id.*)

In January 2019, APN Drummond renewed Plaintiff's prescription for the four-wheeled, seated walker. (Doc. 175-9.) Plaintiff wanted a new walker because his was too short for his height of 6'3' and at 297 pounds, he was close to exceeding the device's recommended weight limit of 300 pounds. (Docs. 175-10, 175-11.) LPN Mixon and APN Drummond sent Plaintiff's

8

request to HSA Rechcigl.  (*Id.*)  On February 7, 2019, HSA Rechcigl told Plaintiff the four-wheeled walker was appropriate, pursuant to the manufacturer's guidelines, for his current weight and height and that the four-wheeled model did not come in a taller version.  (Doc. 175-13.)  He then offered the Plaintiff a taller walker that had only two wheels.  (*Id.*)  Plaintiff decided to keep the shorter, four-wheeled walker.  (*Id.*)  HSA Rechcigl recorded that Plaintiff "left the infirmary ambulating just fine on his current walker and did not slouch or hunch over when medical was not evaluating him."  (*Id.* at 1.)

Plaintiff continued to report pain in his lower back.  Thus, in May 2019, APN Drummond ordered an MRI, which Plaintiff received on June 10, 2019.  (Docs. 175-21, 175-22.)  The MRI revealed Plaintiff had "degenerative disc disease" that was "most pronounced at the L5-S1 level with moderate to marked left and moderate to right neural foraminal narrowing present."  (Doc. 175-23 at 2.)  Plaintiff also had "tiny" or "small" central disc bulges at L3-4, L4-5, and L5-S1.  (*Id.*)

On October 7, 2019, Dr. Kerstein reviewed the MRI results with Plaintiff during a telemedicine appointment.  (Doc. 175-25.)  In the medical records, Dr. Kerstein described the MRI results as "no disc bulge/stenosis/minimal arthritis."  (*Id.* at 1.)  He then discontinued Plaintiff's walker because there was "[n]o clinical indication" for the device.  (*Id.* at 2.)

On November 4, 2019, Plaintiff refused to be examined by Dr. Kerstein for re-evaluation of his request for a walker.  (Doc. 175-27.)  Plaintiff says he did so because he could not get to the infirmary without a walker, wheelchair, or other assistance.  (Docs. 195, 197.)  On November 19, 2019, Plaintiff was taken to the infirmary by wheelchair where he was examined by Dr. Kerstein and a non-party nurse.  (Doc. 175-28.)  While Dr. Kerstein was discussing the MRI, Plaintiff became angry, cursed Dr. Kerstein, and walked out of the infirmary prior to

completion of the physical exam. (*Id.*) Plaintiff says he did so because Dr. Kerstein did not accurately summarize the MRI report, which Plaintiff's mother had recently obtained. (Docs. 195, 197.)

On December 10, 2019, Plaintiff was lying on the floor in the prison hallway. (Doc. 175-29.) He told a responding nurse he needed a walker or wheelchair and that he "sometimes goes days without food and meds" due to severe back pain. (*Id.*) The next day, a non-party nurse assistant observed Plaintiff standing in line to receive donuts in the visiting room. (*Id.*) Plaintiff, who was using a cane obtained from another inmate, showed "no acute distress," and when he saw the nurse assistant looking at him, he "immediately started to walk with a limp and holding his back." (*Id.* at 2)

On December 19, 2019, Plaintiff was taken by wheelchair to the infirmary where Dr. Kerstein offered him a wheelchair or walker without a seat or wheels. (Doc. 175-31.) Plaintiff chose the walker. (*Id.*) During the next four months, Plaintiff refused to meet with Dr. Kerstein several times to discuss his request for a walker with a seat that he could use to carry items such as his food tray. (Docs. 175-32 to 175-35.) Plaintiff says he refused to attend the telemedicine appointments with Dr. Kerstein because he wanted to be examined in person. (Docs. 195, 197.) Soon thereafter, Plaintiff's request for a seated walker was denied because kitchen porters were available to carry his tray. (Docs. 75-5, 175-35, 175-36.)

Thereafter, Plaintiff continued to request a walker with wheels and a seat. On April 28, 2020, APN Bennett examined Plaintiff and reviewed his June 2019 MRI results. (Doc. 175-36.) She then concluded: "In my professional opinion based on [a] physical exam and witnessed findings, the current walker is in good working condition and fully capable of offering stability to this patient." (*Id.* at 3.) She also noted Plaintiff "left [the] infirmary with exaggerated difficulty

and [an] antalgic gait" but after entering the main hall, Plaintiff's "gait had improved." (*Id.* at 2.) In the Complaint, Plaintiff says he was "called" to the infirmary two times in August 2020, but he refused to go due to pain. (Doc. 2 at 58-59.) And, on August 23, 2020, his renewed request for a seated walker was denied. (*Id.*)

Based on these medical records, it is clear Defendants treated Plaintiff's lower back pain "in a reasonable and sensible manner" by providing him with examinations, medications, x-rays, an MRI, and, at times, a walker. *See Fourte*, 746 F.3d at 390; *Logan,* 119 F.3d at 649-50. And Plaintiff admits he refused to attend several telemedicine appointments because he wanted a physical examination, he angrily terminated one appointment due to his disagreement with the doctor's interpretation of an MRI, and he did not attend two appointments in August 2020. *See Beck,* 253 F.3d at 333-34; *Gibson,* 433 F.3d at 646 (a prisoner's "decision to decline medical treatment" was a relevant factor in granting summary judgment).

Plaintiff takes issue with HSA Rechcigl's February 2019 failure to provide him with a taller, four-wheeled walker. But there is no evidence such a walker was available, or more importantly, medically necessary to treat Plaintiff's lower back pain.

Similarly, Plaintiff says Dr. Kerstein was deliberately indifferent in October 2019 when he discontinued the four-wheeled, seated walker that had been previously given to him by a prison medical provider and renewed by APN Drummond. And, he says Dr. Kerstein and LPN Mixon were deliberately indifferent in December 2019 and April 2020 when they gave him a walker without wheels or a seat. But prison medical providers are free to exercise their independent medical judgment. *Barr*, 909 F.3d at 921–22; *Hines v. Anderson*, 547 F.3d 915, 920 (8th Cir. 2008). And a disagreement between medical professionals about the appropriate treatment does not rise to the level of a constitutional violation. *See Long v. Nix,* 86 F.3d 761, 765-66 (8th Cir.

1996); *White v. Farrier*, 849 F.2d 322, 327 (8th Cir. 1988); *Noll v. Petrovsky*, 828 F.2d 461, 462 (8th Cir. 1987). Importantly, Dr. McClure says in his affidavit that based on the June 2019 MRI and Plaintiff's physical abilities, "there was no indication for Mr. Ross to utilize a wheeled walker, and Dr. Kerstein appropriately terminated the order" in October 2019. (Doc. 202-1 at 2.) Plaintiff says Dr. Kerstein's decision, two months later, to give him a walker is evidence that he erred when he took the device away in October 2019. (Docs. 195, 197.) However, Dr. McClure explains that "[a]though a walker was not medically necessary based on Mr. Ross's medical conditions," he was later provided with a walker based on Plaintiff's continued requests rather than a medical necessity. (Doc. 202-1 at 2.)

Plaintiff also believes an MRI of his lower back should have been repeated and that he should have been sent to an orthopedic specialist. But, as previously explained, Plaintiff is not constitutionally entitled to the medical care of his choosing and there is no evidence Defendants acted with deliberate indifference in treating his lower back pain. *See Barr*, 909 F.3d at 921-22. To the contrary, Dr. McClure says in his affidavit Defendants provided Plaintiff with adequate and appropriate care for his lower back issues. (Doc. 202-1.) And Plaintiff has not offered any refuting evidence. Accordingly, I conclude Defendants are also entitled to summary judgment on this claim.

That being said, I am not unsympathetic to the pain and complications Plaintiff has endured as a result of his complex medical issues. But, deliberate indifference is a high threshold. And, for the reasons I have explained, nothing in the record suggests Defendants acted with deliberate indifference when they repeatedly and promptly provided Plaintiff with a variety of testing, medications, and treatments for his medical needs.

### B. Corrective Inaction Claim

Plaintiff says HSA Gardner violated his constitutional rights when she failed to take corrective action in response to his medical grievances. Prison supervisors, such as Defendant Gardner, can be held liable in a § 1983 action if they had actual knowledge a prisoner was receiving inadequate medical care and failed to take corrective action. *See Williams v. York,* 891 F.3d 701, 707 (8th Cir. 2018); *Langford,* 614 F.3d at 460-62. But nothing suggests Plaintiff was receiving inadequate medical care for his lower back pain or other medical conditions. Thus, Plaintiff's corrective inaction claim against HSA Gardner fails as a matter of law. *See Marsh v. Phelps Cty.,* 902 F.3d 745, 754-57 (8th Cir. 2018) (to sustain a corrective inaction claim, the supervisor must have actual knowledge of a constitutional violation that needs to be corrected); *Sims v. Lay,* Case No. 05-2136, 2007 WL 328769 (8th Cir. Feb. 2, 2007) (unpublished decision) (a corrective inaction claim fails, as a matter of law, when there is no evidence of an underlying constitutional violation to correct).

### C. Policy and Practice Claim

Plaintiff says Wellpath LLC as well as Officers Dominicus, Perez, and Pangburn created or condoned a policy, practice, or custom of improperly denying constitutionally inadequate medical care to prisoners for cost-saving reasons.[3] *See Johnson v. Hamilton,* 452 F.3d 967, 973 (8th Cir. 2006) (a corporation can be held liable, in a § 1983 action, only if there was a "policy, custom, or official action that inflicted an actionable injury"). Defendants deny this allegation in

---

[3] In his Objections and Motion, Plaintiff says Defendants have an unconstitutional policy of charging co-payments for medical treatment. (Docs. 195, 197.) That, however, is not the policy and practice claim raised in the Complaint. (Doc. 2.) Further prisoners do not have a constitutional right to free medical care, as long as they are not denied medical care due to an inability to pay. *Roberson v. Bradshaw*, 198 F.3d 645, 647 (8th Cir. 1999); *Blaise v. McKinney*, Case No. 98-3916, 1999 WL 486854 (8th Cir. July 12, 1999).

their affidavits and say they were not "involved in the provision of medical care" to Plaintiff or other inmates at the East Arkansas Regional Unit. (Docs. 175-38, 175-39, 175-40.) Plaintiff has not offered any evidence contradicting their affidavits or otherwise establishing an unconstitutional policy, practice, or custom causing him to receive inadequate medical care. *See Conseco Life Ins. Co. v. Williams*, 620 F.3d 902, 909 (8th Cir. 2010) ("When the movant makes a *prima facie* showing of entitlement to summary judgment, the respondent must discard the shielding cloak of formal allegations and meet proof with proof by showing a genuine issue as to a material fact"); *Southworth v. Mo. Dep't of Corrs,* No. 06-3735, 2007 WL 4531500 (8th Cir. Dec. 27, 2007) (affirming summary judgment when a prisoner did not have evidence that a policy, custom, or practice caused him to receive constitutionally inadequate medical care). Accordingly, I conclude Defendants Wellpath LLC, Dominicus, Perez, and Pangburn are entitled to summary judgment on this claim.

## IV. CONCLUSION

IT IS, THEREFORE, RECOMMENDED that:

1. Plaintiff's Motion for Summary Judgment, Declaratory Judgment, and Directed Verdict (Doc. 197) be DENIED.

2. Defendants' Motion for Summary Judgment (Doc. 173) and Supplemental Motion for Summary Judgment (Doc. 202) be GRANTED.

3. Plaintiff's claims against Defendants Bennett, Campbell, Dominicis, Drummond, Gardner, Kerstein, Mixon, Pangburn, Perez, Rechcigl, and Wellpath LLC be DISMISSED with prejudice.

4. This case be closed.

5. The Court certify, pursuant to 28 U.S.C. § 1915(a)(3), that an *in forma pauperis*

appeal from an Order adopting this Recommendation and the accompanying Judgment would not be taken in good faith.

DATED this 6th day of June 2022.

_____
JOE J. VOLPE
UNITED STATES MAGISTRATE JUDGE